UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF NEW YORK

_____

THE UNITED STATES OF AMERICA

       *ex rel.*

FOX UNLIMITED ENTERPRISES, LLP

                Plaintiff/Relator,

   v.

HENSEL PHELPS CONSTRUCTION COMPANY,
and JOHN DOES #1-50, FICTITIOUS NAMES,

             Defendants.

_____

DKT #1
Matt

**COMPLAINT**

**CONFIDENTIAL
FILED UNDER SEAL**

**Civ. No.:** 1:22-cv-355
(GLS/CFH)



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
APR 1 5 2022
AT_____ O'CLOCK_____
John M. Domurad, Clerk - Albany

**TABLE OF CONTENTS**

Page

I.    PRELIMINARY STATEMENT AND NATURE OF THE ACTION ...............................1

II.   JURISDICTION AND VENUE .......................................................................................3

III.  PARTIES ........................................................................................................................4

    A.   Plaintiff/Relator.....................................................................................................4

    B.   Defendants ............................................................................................................ 4

        1.   Hensel Phelps Construction Company......................................................... 4

        2.   John Does Nos. 1-50, Fictitious Names....................................................... 5

IV.   REGULATORY BACKGROUND .................................................................................5

    A.   Federal Contracting Process for Construction Projects ......................................... 6

    B.   Federal Small Business Subcontracting................................................................. 7

        1.   Certification Requirements ........................................................................ 10

        2.   Affiliation Principles for Small Businesses ............................................... 11

    C.   Post-Award Subcontracting Plans........................................................................ 12

        1.   Duty to Comply in Good Faith with a Subcontracting Plan ...................... 15

        2.   Duty to Submit Truthful Reports ............................................................... 16

        3.   Certifications Made in Progress Payment Requests Include Certification of Good Faith Compliance with the Subcontracting Plan .................................................................................................... 17

    D.   The "Presumed Loss Rule" Under the Small Business Act of 2010 .................... 18

    E.   The False Claims Act............................................................................................ 19

    F.   The Anti-Kickback Act of 1986 .......................................................................... 21

V.    DEFENDANTS' FRAUDULENT CONDUCT .................................................................23

VI.   DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS..................................................................................................31

VII.  DEFENDANTS IMPROPERLY SOLICITED/PAID /RECEIVED KICKBACKS IN VIOLATION OF THE AKA ..............................................................................33

COUNT I  (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) .......................................35

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ......................................36

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ....................................36

VIII.   PRAYER FOR RELIEF ....................................................................................................37

IX.     JURY TRIAL DEMAND .................................................................................................38

000161.01140 Litigation 16171080v1

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## UNDER 31 U.S.C. § 3729

This is an action brought on behalf of the United States of America by Relator Fox Unlimited Enterprises, LLP, by and through its attorneys, against Defendant Hensel Phelps Construction Company and John Does #1-50, Fictitious Names, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA").

## I.   PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.   This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Defendants knowingly presented, or caused to be presented, to the United States and its agents and intermediaries in violation of the FCA.

2.   At issue in this case is Defendant Hensel Phelps Construction Company's ("Hensel Phelps") fraudulent course of conduct related to at least one large and important government project, namely the Armed Forces Retirement Home ("AFRH")—a retirement community in Washington, D.C. that houses veterans and active-duty members of the United States Armed Forces.

3.   In approximately 2011, Hensel Phelps was awarded a $68 million contract by the General Services Administration ("GSA") to develop the AFRH's New Commons/Health Care Building located at 3700 North Capitol Street, NW in Washington, D.C.  The project scope included supplying and installing kitchen equipment.  Because Hensel Phelps did not normally perform these specific services, it needed to subcontract the work to another company.  And per the terms of its contract with GSA, Hensel Phelps could claim financial credit from the government for awarding subcontracts on the AFRH project to eligible small businesses, so there was a financial incentive to subcontract the kitchen equipment project to a small business.

4.      Hensel Phelps—a large business under the relevant Small Business Administration ("SBA") size standards—used the small business classifications of at least one small business, including service-disabled veteran-owned small businesses ("SDVOSBs"), as part of an illegal pass-through scheme.  The pass-through scheme allowed Hensel Phelps to falsely gain monetary credit in the form of bonuses from the government for awarding millions of dollars in subcontracts to small businesses—when Hensel Phelps knew those subcontracts were actually performed by large businesses—which resulted in higher revenues and profits.

5.      In perpetration of its fraudulent conduct, Hensel Phelps made numerous materially false statements and certifications to the government relating to its small business subcontracts. For example, despite knowing that it was using the SDVOSB subcontractor as merely a pass-through and was not actually performing any material work on these projects, Hensel Phelps:

- falsely certified and represented to the government that it intended to comply in good faith with the terms of its Subcontracting Plan;

- submitted monthly progress payment requests certifying and representing to the government that it was fulfilling its material obligations to comply in good faith with its Subcontracting Plan; and

- filed false Interim Subcontracting Reports ("ISRs") concerning the progress toward meeting its Subcontracting Plan.

6.      Hensel Phelps also paid illegal "fees" (also referred to as "small business fees" or "administrative fees") for the use of the SDVOSB's small business classification.  These unlawful payments violated the terms of the Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8701–8708, by providing and/or receiving any "thing of value … that is provided to a prime contractor, prime contractor employee, subcontractor, or subcontractor employee to improperly obtain or reward

2

favorable treatment in connection with a prime contract or a subcontract relating to a prime contract." *Id.* at § 8701(2).

7.      As a direct, proximate, and foreseeable result of Hensel Phelps' fraudulent course of conduct set forth herein, from at least 2011 through 2014, Hensel Phelps knowingly made numerous false express and implied certifications and/or caused the submission of false or fraudulent statements and false claims to government programs for payment for their services.

8.      As a result of these false certifications, reports, and claims, the government was falsely and/or fraudulently induced to conduct hundreds of transactions with Hensel Phelps, in the form of bonuses fraudulently paid.  Because the United States was falsely and/or fraudulently induced to complete these transactions with Hensel Phelps, each claim for payment under the contracts was a false claim.

9.      Accordingly, Relator, on behalf of the United States, and pursuant to the FCA, seeks all applicable damages and penalties from Defendants for knowingly submitting false claims.

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the FCA, pursuant to 31 U.S.C. §§ 3730, 3732.

11.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

12.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because acts that form the basis of this Complaint occurred in this judicial district and is a related-case to matter 1:19-cv-914 pending before Judge Gary L. Sharpe.

13.     The causes of action alleged herein are timely brought because of, among other things, efforts by Defendants to conceal their wrongdoing.

000161.01140 Litigation 16171080v1

## III.   PARTIES

### A.   PLAINTIFF/RELATOR

14.     Relator/Plaintiff Fox Unlimited Enterprises, LLP, a Delaware limited liability partnership, brings this action on behalf of itself and the United States of America. The registered office of the Relator is 28 Old Rudnick Lane in Dover, Delaware 19901, and the name of the registered agent at such address is URS Agents, LLC.

15.     Pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, Fox Unlimited Enterprises, LLP is not distinct from its partners, at least one of whom has personal knowledge of the false claims, statements, and concealments alleged herein.

16.     Relator has direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation based on its experience and knowledge to uncover and report the fraud alleged herein.

17.     Accordingly, Relator is the "original source" of the non-public information alleged in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A)–(B).

18.     Prior to the filing of this Complaint, Relator provided the government with written disclosure of substantially all material evidence and information that Relator possessed, in accordance with 31 U.S.C. § 3730(b)(2).

### B.   DEFENDANTS

#### 1.   Hensel Phelps Construction Company

19.     Defendant Hensel Phelps Construction Company is a Delaware general partnership, with its principal place of business located at 420 Sixth Avenue, Greeley, Colorado 80631. Hensel Phelps is in the business of providing general construction contracting services.

### 2.   John Does Nos. 1-50, Fictitious Names

20.   John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme alleged herein.

21.   To the extent that any of the conduct or activities described in this Complaint was not performed by Defendants, but by the individuals or entities alleged herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme alleged herein.

22.   As a result of Defendants' actions, the United States has suffered significant financial harm.

## IV.   REGULATORY BACKGROUND

23.   The federal government is the world's largest buyer of services and goods. Purchases by military and civilian agencies amount to nearly $600 billion a year and include everything from complex space vehicles to the paving of parking lots.

24.   Recognizing that small businesses are the engine of economic growth in the United States, the federal government has adopted a policy of requiring its agencies to award prime and subcontracting opportunities to small and disadvantaged businesses.

25.   Accordingly, the federal government has enacted a government-wide prime contracting goal that at least 23% of all federal government contracting dollars should be awarded to small and disadvantaged businesses.

26.    The federal government has also set targeted sub-goals for women-owned small businesses ("WOSBs") (5%), small disadvantaged businesses (5%), firms located in HUBZones (3%), and SDVOSBs (3%).

27.    It is the responsibility and mission of the SBA to help federal agencies ensure that the above goals are met and that small businesses get their fair share of federal contracting dollars.

A.    FEDERAL CONTRACTING PROCESS FOR CONSTRUCTION PROJECTS

28.    The federal government generally obtains contracts for large construction projects through a competitive negotiation process that involves two phases. The process begins when the contracting officer issues a solicitation that delineates the scope of work and states the government's requirements, including, but not limited to, design criteria, budget parameters, and schedule. *See* FAR § 36.302.3.

29.    In Phase I, the solicitation typically covers the technical aspects of the project. *See Id.* at § 36.303-1. General contractors submit proposals for the project. The government evaluates each offeror's technical competencies and other non-price/cost-related factors against stated evaluation criteria. The government then selects the most highly qualified offerors, which generally does not exceed a maximum number specified in the solicitation and, in any case, does not exceed five offerors. *Id.*

30.    In Phase II, the selected offerors submit proposals that expound upon the technical aspects and include cost proposal data. *See* FAR §§ 15.304; 36.303-2. If the amount of the contract is expected to exceed $1.5 million, the offeror's Phase II proposal must include a Subcontracting Plan detailing the extent of participation of small business concerns, which constitutes the "socioeconomic evaluation factor" of the offeror's proposal. *See id.* at §§ 15.304(c)(4); 19.702. Subcontracting Plans require large businesses to state the amount of planned subcontracting dollars that will go to specified categories of small businesses.

6

31.     In awarding these large construction contracts, the government does not seek the lowest possible bidder to perform the work.  Instead, the government seeks the contractor that can best deliver the full continuum of final product, consistent with all goals, laws, rules, and regulations applicable to the product, which include certain requirements for the participation of Small and/or Disadvantaged Business Enterprises through the requisite Small Business Subcontracting Plan. *See* FAR § 15.101. As established in various federal statutes and regulations, these include business concerns that are a Small Business ("SB"), WOSB, Veteran Owned Small Business ("VOSB"), SDVOSB, qualified HUBZone small business, and a small business owned and controlled by socially and economically disadvantaged individuals ("DBE").

### B.     FEDERAL SMALL BUSINESS SUBCONTRACTING

32.     The Small Business Act encourages prime contractors to award subcontracts to small companies, including those with various special socioeconomic designations recognized by the SBA, so that they will have the "maximum practicable opportunity to participate in the performance" of Federal contracts.  Section 2 of the Small Business Act states:

> The essence of the American economic system of private enterprise is free competition.  Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured.  The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631(a).

33.     The Small Business Act provides that to be considered a small business, an entity must be independently owned and operated as well as not dominant in its field.  *Id.* § 632(a)(1).

34.     Section 632 also authorizes the SBA to promulgate more specific standards by which a business may be deemed a small business concern.  Pursuant to that authority, the SBA has issued specific size standards that determine whether a business qualifies as a small business concern.

35.     A Small Business "size standard" is numerical and represents the largest a concern can be and still be considered a small business.  *See* 13 C.F.R. §§ 121.101–102.

36.     The SBA uses one of two measures to determine whether a company is considered small.  The industry in which a company performs its work determines which measure applies.  Some industries use annual receipts, while others use employee count.  13 C.F.R. § 121.101.

37.     The majority of the transactions at issue in this Complaint use an employee count size standard.  As applicable in this action, a company is considered "small" if it has fewer than a specified number of employees.  This is called the "size standard."  13 C.F.R. §§ 121.101; 121.106(b)(1).

38.     The size standard varies based on the specific contract the company is bidding on; a company could be considered a small business for some contracts but not others.   Contract solicitations issued by government agencies contain a North American Industry Classification System code or "NAICS code."  NAICS codes are numeric designations that divide economic activity into discrete sectors and subsectors for the purpose of classifying what goods and services businesses provide.  Each NAICS code is associated with a particular size standard (either employee count or annual receipts).  13 C.F.R. § 121.402(a)

39.     The SBA size standard limitation to qualify as a "Small Business Concern" for businesses in the food service equipment subsector, is 500 employees.  *See* U.S. Small Bus.

8

Admin., Table of Small Business Size Standards Matched to North American Industry Classification System Codes 6 (Feb. 26, 2016), *available at* http://www.sba.gov/sites/default/files/files/Size_Standards_Table.pdf (last visited July 31, 2018); *see also* 13 C.F.R. § 121.201.

40.     The number of employees a company has is determined based on the average number of employees for the preceding twelve calendar months. 13 C.F.R. § 121.106(b)(1). Full-time, part-time, and temporary employees are all counted as "employees" for size purposes. 13 C.F.R. § 121.106(a).   In determining the size of the company, the government counts all employees of that company as well as all employees of the company's "affiliates."   13 C.F.R. § 121.106(b)(1).

41.     SBA regulations include a multi-factor test for affiliation.   In general, "[c]oncerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both.   It does not matter whether control is exercised, so long as the power to control exists." 13 C.F.R. § 121.103(a)(1) (2007).   Affiliation may be determined based on "factors such as ownership, management, previous relationships with or ties to another [business] concern, and contractual relationships[.]" *Id.* § 121.103(a)(2). Affiliation can also be found "where an individual, concern, or entity exercises control directly or indirectly through a third party." *Id.* § 121.103(a)(4).   Affiliation is determined based on the "totality of the circumstances." *Id.* § 121.103(a)(5).

42.     The regulations also include a number of specific tests for affiliation.   A person or company is deemed to control a concern when the person owns, or has the power to control, 50 percent or more of a concern's voting stock, 13 C.F.R. § 121.103(c)(1), such that two businesses are affiliated when a person or entity has 50 percent or more of the voting stock of each business.

9

Affiliation also arises "where one or more officers, directors, managing members, or partners who control the board of directors and/or management of one concern also control the board of directors or management of one or more other concerns." *Id.* § 121.103(e).

### 1. Certification Requirements

43. Contractors must complete annual electronic representations and self-certifications in the System for Award Management ("SAM") database—a Government-owned and operated website used by businesses who register to do business with the government.

44. Contractors are required to update the representations and certifications submitted to SAM as necessary, but at least annually, to ensure that they are kept current, accurate, and complete.

45. The representations and self-certifications are effective for one year from the date of submission or update to SAM. Pursuant to FAR § 52.212-3, contractors represent whether they meet the status requirements for various small business categories.

46. For the purposes of federal procurement programs for which status as a small business is required, a concern must not exceed the size standard under the applicable NAICS code specified in the solicitation, whether the threshold is based upon number of employees or annual revenues. 13 C.F.R. §§ 121.401–121.413.

47. Each NAICS industry code has a corresponding size standard, and the table is published annually in the Federal Register. *Id.* § 121.101.

48. Both submissions of bids set aside for small businesses and registrations in the SAM.gov database for the purpose of being considered for an award as a small business concern are deemed "affirmative, willful and intentional certifications of small business size and status." 15 U.S.C. § 632(w)(2).

49.     Each time a business enters into a set-aside contract with the government and each time it files its annual SAM.gov certification, it becomes subject to a stiff sanctions regime intended to deter small business fraud.

50.     In addition to other laws that may be applicable, section 16(d) of the Small Business Act provides severe criminal penalties for knowingly misrepresenting the small business size status of a concern in connection with procurement programs. 15 U.S.C. § 645(d).

51.     Section 16(a) of the Act also provides, in part, for criminal penalties for knowingly making false statements or misrepresentations to SBA for influencing in any way the actions of the Agency.  15 U.S.C. § 645(a); *see also* 13 C.F.R. § 121.108.

52.     These and other penalties are set forth in the certifications made by each business concern bidding under a small business set-aside: "any person who misrepresents a firm's status as a business concern that is small . . . in order to obtain a contract to be awarded under the preference programs established pursuant to section 8, 9, or 15, 31, and 36 of the Small Business Act shall (i) Be punished by imposition of fine, imprisonment, or both; (ii) Be subject to administrative remedies, including suspension and debarment; and (iii) Be ineligible for participation in programs conducted under the authority of the Act." 15 U.S.C. § 645(d).

### 2.     Affiliation Principles for Small Businesses

53.     The affiliation concept is important to government contractors because it can have a significant impact on whether a business is deemed large or small.  Small businesses are eligible to participate in numerous beneficial government programs.  The SBA determines the size of a business by examining a company's average annual revenue or number of employees.  When two companies are affiliated, the SBA combines the revenue or number of employees of both companies.  Thus, each company is less likely to fall below the SBA's applicable limit and is less likely to be eligible for preferred contracting status.

54.     "Affiliation" exists between businesses when one business, directly or indirectly, controls or has the power to control another business, or when a third party, directly or indirectly, controls or has the power to control both businesses. *See* 13 C.F.R. § 121.103(a); FAR § 19.101; U.S. Small Bus. Admin., A Handbook for Small Business Liaison Officers ("SBLO Handbook") 16 (June 2010), *available at* https://www.sba.gov/sites/default/files/articles/Small_Business_Liaison_Officer_(SBLO)_Hando ook_6_2010.pdf.  Control may arise through ownership, management, or other relationships or interactions between the parties. *See* 13 C.F.R. § 121.103(a).  If one or more officers, directors, managing members, or general partners of a business control the Board of Directors and/or the management of another business, the businesses are affiliates. *See id.* § 121.103(e).

55.     The ostensible subcontractor rule prohibits a small business contractor from being unusually reliant upon its subcontractor, or a subcontractor to perform primary or vital responsibilities of the contract.  *Id.* § 121.104(h)(4).  The rule is intended to prevent other than small firms from forming relationships with small firms to evade SBA's size requirements.

56.     In determining a violation of this rule, the SBA considers all aspects of the relationship, including the terms of the proposal, SBA limitations on subcontracting, project management, division of work, the percentage of the prime contract work the subcontractor will perform, relative experience and profit sharing.  *Id.*

## C.     POST-AWARD SUBCONTRACTING PLANS

57.     As articulated in then-Senator Mary Landrieu's September 29, 2010 Committee report on the Small Business Contracting Revitalization Act of 2010, prime contractors are awarded lucrative construction projects based, in large part, on promises made to meet or exceed small business goals, and serious changes were required to hold them accountable:

12

> To prevent prime contractors from taking advantage of small business subcontractors through bait-and-switch fraud, the bill requires large prime contractors to certify that they will use small business subcontractors in the amount and quality used in preparing their winning bid or proposal, unless such firms no longer are in business or can no longer meet the quality, quantity or delivery date. The Committee expects that Federal agencies will use all appropriate legal and contractual remedies to deter, punish, and recover the proceeds of such fraud.

S. Rep. No. 111-343, at 7 (2010).

58.    The Small Business Act reflects a policy "that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems." 15 U.S.C. § 637(d)(1).

59.    The Small Business Act also requires that the language quoted in paragraph 92 be inserted into every federal prime contract (other than certain specified contracts not relevant here), and further requires that every Federal prime contract include a clause stating that "[t]he contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract." *Id.* at § 637(d)(3).

60.    The Small Business Act further emphasizes the importance of ensuring that small and other disadvantaged contractors participate in the performance of subcontracts by requiring prime contractors to submit subcontracting plans to the procuring agencies showing "percentage goals for the utilization" of these companies in performing the contract. *Id.* at § 637(d)(4), (d)(6).

13

61.     The Small Business Act provides: "The Subcontracting Plan shall be included in and made a material part of the contract." *Id.* at § 637(d)(4)(B)(iv). Further, the Subcontracting Plan must contain assurances that each offeror or bidder will submit "periodic reports … in order to determine the extent of compliance by the offeror or bidder with the subcontracting plan." *Id.* at § 637(d)(6)(E).

62.     The Small Business Act further states:

> No contract shall be awarded to any offeror unless the procurement authority determines that the plan to be negotiated by the offeror pursuant to this paragraph provides the maximum practicable opportunity for small business concerns, qualified HUBZone small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to participate in the performance of the contract.

*Id.* at § 637(d)(4)(D).

63.     Accordingly, the Small Business Act makes a prime contractor's representation that it is in compliance with its small business Subcontracting Plan, and will remain in compliance with the Plan, a material condition of the award and continuing performance. *Id.* at § 637(d)(4)(B), (D).

64.     The Small Business Act further provides that a prime contractor or subcontractor's failure to comply in good faith with a Subcontracting Plan and the policy encouraging the greatest possible participation of disadvantaged small businesses, including SDVOSBs, constitutes a "material breach" of the contract or subcontract. *Id.* at § 637(d)(9).

65.     The Small Business Act also states that any small business concern that misrepresents its small business status shall be subject to penalties under the FCA. *Id.* at § 637(m)(5)(C).

14

### 1.   Duty to Comply in Good Faith with a Subcontracting Plan

66.   Each successful prime contractor with a Subcontracting Plan is required to make "a good faith effort to achieve the dollar and percentage goals and other elements in its Subcontracting Plan." 13 C.F.R. § 125.3.

67.   A contractor that fails to comply in good faith with its Subcontracting Plan, including the goals stated therein, or with FAR § 52.219-8 ("Utilization of Small Business Concerns") is in material breach of its contract. *See* 15 U.S.C. § 637(d)(8); FAR § 19.702(c).

68.   This good faith obligation is expressly incorporated into all construction contracts requiring a Subcontracting Plan. *See* FAR § 52.219-9, 52.219-9(k) ("As prescribed in 19.708(b), insert the following clause: … The failure of the Contractor or subcontractor to comply in good faith with— (1) The clause of this contract entitled 'Utilization of Small Business Concerns;' or (2) An approved plan required by this clause, shall be a material breach of the contract.").

69.   Section 19.705-7(a) of the FAR provides: "Maximum practicable utilization of small business, veteran-owned small business, service-disabled veteran owned small business, HUBZone small business, small disadvantaged business and women-owned small business concerns as subcontractors in government contracts is a matter of national interest with both social and economic benefits. When a contractor fails to make a good faith effort to comply with a Subcontracting Plan, these objectives are not achieved, and 15 U.S.C. § 637(d)(4)(F) directs that liquidated damages shall be paid by the contractor."

70.   "Failure to make a good faith effort to comply with the Subcontracting Plan means willful or intentional failure to perform in accordance with the requirements of the Subcontracting Plan, or willful or intentional action to frustrate the plan." FAR § 19.701.

71.   The liquidated damages provision provides a specific, agreed-upon measure for determining the damage to the government when a contractor fails to comply in good faith with

its Subcontracting Plan. Specifically, "[t]he amount of damages attributable to the contractor's failure to comply shall be an amount equal to the actual dollar amount by which the contractor failed to achieve each subcontracting goal." *Id.* at § 19.705-7(b).

72.     The liquidated damages provision, including the measure of damages stated therein, is required to be incorporated into solicitations and contracts with the government. *See Id.* at §§ 19.708(b) & 52.219-16. Further, "[l]iquidated damages shall be in addition to any other remedies that the government may have." *Id.* at § 19.705-7(g).

73.     Thus, pursuant to the above-referenced statutes and regulations, "[a]n other-than-small contractor that fails to make a good faith effort to achieve the goals in its Subcontracting Plan may be found in material breach of contract and terminated for default, or liquidated damages may be imposed." U.S. Small Bus. Admin., SBLO Handbook, at 30.

74.     The use of a pass-through arrangement—whereby a prime contractor subcontracts with a small business entity which then subcontracts all of the work under the contract to a large business—is not good faith compliance with a Subcontracting Plan.

75.     As stated by the SBA: "[A] pass-through . . . adds little or no value to the procurement. It does not comport with the spirit or intent of the subcontracting program." *Id.* at 77.

### 2.   Duty to Submit Truthful Reports

76.     Throughout the lifetime of the contract, contractors must "[s]ubmit periodic reports so that the government can determine the extent of compliance by the offeror with the subcontracting plan." FAR § 19.704(a)(10)(ii). A prime contractor is responsible for submitting "timely, accurate, and complete" reports. 13 C.F.R. § 125.3. For example, prime contractors must electronically submit the Individual Subcontracting Report ("ISR") and Summary Subcontracting Report ("SSR"). See FAR §§ 19.704(a)(10)(iv)(A)-(B), 52.219-9(l)(1)-(2).

16

77.    The ISR "collects prime contractor and subcontractor subcontract award data" and is required to be submitted by the prime contractor twice a year (by April 30 and October 30 of each year). General Servs. Admin., Electronic Subcontracting Reporting System (eSRS) Quick Reference Recommendation for Federal Government Contractors: Submitting an Individual Subcontracting Report (ISR) 2-3 (Sept. 29, 2015), *available at* https://www.esrs.gov/documents/eSRS_Quick_Reference_for_Subcontractors_filing_an_ISR_R eport.pdf. In the ISR, the prime contractor must provide data showing its small business subcontracting goals compared to its actual performance. *See id.* at 13-20.

78.    If the prime contractor fails to meet the goals in its Subcontracting Plan, the contractor must "explain the reason for any shortfalls" in the "Remarks" section of the ISR. *Id.* at 20.    When submitting the ISR, the contractor must certify that "the data being submitted on the report is accurate and that the dollars and percentages reported do not include lower tier subcontracts" or the report will be rejected. *Id.*

### 3.    Certifications Made in Progress Payment Requests Include Certification of Good Faith Compliance with the Subcontracting Plan

79.    In a fixed-price construction contract, the government makes progress payments to the contractor on a monthly basis as the work proceeds. *See* FAR § 52.232-5(b). Each time a contractor makes a request for progress payments, the contractor must make "the following certification, or payment shall not be made: "I hereby certify, to the best of my knowledge and belief, that . . . [t]he amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract." *Id.* at § 52.232-5(c). This certification provision is required to be included in the contract. *See id.*

80.     By making such a certification, the contractor attests that the amount of money requested is only for performance in accordance with the material contractual obligation to comply in good faith with its Subcontracting Plan and the goals therein.

81.     If the agency discovers that a "contractor's request for … progress payments under a contract awarded by that agency is based on fraud," the agency head may "reduce or suspend further payments to the contractor." FAR § 32.6-4. "Such reduction or suspension shall be reasonably commensurate with the anticipated loss to the government resulting from the fraud." *Id.* The "[a]uthority to reduce or suspend payments … is in addition to other government rights, remedies, and procedures." *Id.* at § 32.6-1.

82.     Additionally, a contractor must timely disclose to the agency when the contractor's principal, employee, agent, or subcontractor has committed a violation of the FCA. *See* FAR § 52.203-13.

**D.     THE "PRESUMED LOSS RULE" UNDER THE SMALL BUSINESS ACT OF 2010**

83.     The Small Business Act of 2010 codified the calculation of damages for misrepresentation under the FCA, which significantly increases the ante for prosecutions both by the government and qui tam relators.

84.     Section 1341 of the Jobs Act, also called the "Presumed Loss Rule," provides a presumption of loss to the government equal to the total amount expended on the contract.  15 U.S.C. § 632(w)(1). The offender may not discount the measure of damages by crediting the value of services or goods provided to the government under the contract.  *Id.*

85.     Through this Act, Congress established that the government's damages calculation shall use an intended beneficiary analysis.  That is, where the government intended the contract to benefit an eligible small business, and an ineligible business received the benefit of that contract, the entire amount paid to the ineligible contractor becomes the loss to the government.

18

86.     This codification is significant because contractors are liable for three times the total amount of money received under the contract, plus penalties and fees.  31 U.S.C. § 3729.

87.     The new law also changes the certification process for small businesses.  As part of a bid or proposal, small businesses have historically needed to self-certify that they are an eligible small business.  Under the Small Business Act, businesses must both initially register as a small business and annually update their status in the SAM database.  These self-certifications are based on the honor system enforced by significant legal exposure if not accurate.

88.     The Small Business Act also includes a Deemed Certification provision.  Under this provision, a proposal or bid for a federal contract or subcontract "intended for award to small business concerns" constitutes an "affirmative, willful, and intentional certification[] of small business size and status." 15 U.S.C. § 632(w)(2)(A)-(B).  A contractor also makes such a certification by registering as a small business concern "on any Federal electronic database for the purpose of being considered for award of a Federal ... contract [or] subcontract." *Id.* § 632(w)(2)(C).

### E.     THE FALSE CLAIMS ACT

89.     Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the FCA, 31 U.S.C. §§ 3729-3733, is the primary tool with which the United States combats fraud against the government and protects the federal Treasury.  The Supreme Court has held that the FCA's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the government." *United States v. Neifert-White*, 390 U.S. 228, 232 (1968).

90.     The FCA provides that a person is liable to the United States for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the

United States government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

91.    The FCA establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government." *Id.* § 3729(a)(2).  The FCA further establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id.* § 3729(a)(1)(B).

92.    The FCA defines "knowingly" to mean that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," and further provides that no proof of specific intent to defraud is required. *Id.* § 3729(b).

93.    The FCA defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or, (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the government's behalf or to advance a government program or interest, and if the United States government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 3729(b)(2)(A).

94.    Any person who violates the FCA is liable to the United States for a civil penalty of not less than ten thousand nine hundred fifty-seven dollars ($10,957) and not more than twenty-one thousand nine hundred sixteen dollars ($21,916), plus three times the amount of damages

which the government sustains because of the act of that person. *Id.* § 3729(a); 15 C.F.R. § 63(a)(3).

F.   **THE ANTI-KICKBACK ACT OF 1986**

95.   The Anti-Kickback Act ("AKA"), 41 U.S.C. §§ 8701–8708, modernized and closed the loopholes of previous statutes applying to government contractors. The AKA applies to a broad range of persons involved in government subcontracting.

96.   The AKA prohibits attempted as well as completed "kickbacks," *id.* § 8702, which include any money, fees, commission, credit, gift, gratuity, thing of value, or compensation of any kind, *id.* § 8701(2). The Act also establishes that the inclusion of kickback amounts in contract prices is prohibited conduct in itself. *Id.* § 8702(3).

97.   The AKA requires only that the purpose of the kickback was for improperly obtaining or rewarding favorable treatment in connection with a contract. *Id.* § 8701(2). It is intended to embrace the full range of government contracting.

98.   The AKA prohibits the payment, solicitation and receipt of kickbacks by prime contractors, prime contractor employees, subcontractors, and subcontractor employees. These terms are defined in the Act. *Id.* § 8701(5)-(9).

99.   The AKA defines "kickbacks" to include payments under any government contract. *Id.* § 8701(2).

100.   The AKA imposes criminal sanctions for knowing and willful violations.

101.   The AKA requires each contracting agency to include in each prime contract exceeding $100,000 for other than commercial products or services, a requirement that the prime contractor shall "have in place and follow reasonable procedures designed to prevent and detect violations of section 8702 of this title in its own operations and direct business relationships," and

"cooperate fully with a Federal Government agency investigating a violation of section 8702 of this title." *Id.* § 8703(a)(1)-(2).

102.   Section 3.502-2(i)(1) interprets the "reasonable procedures" required by the AKA to include, for example: "company ethics rules prohibiting kickbacks by employees, agents, or subcontractors; education programs for new employees and subcontractors, explaining policies about kickbacks, related company procedures and the consequences of detection; procurement procedures to minimize the opportunity for kickbacks; audit procedures designed to detect kickbacks; periodic surveys of subcontractors to elicit information about kickbacks; procedures to report kickbacks to law enforcement officials; annual declarations by employees of gifts or gratuities received from subcontractors; annual employee declarations that they have violated no company ethics rules; [and] personnel practices that document unethical or illegal behavior and make such information available to prospective employers."

103.   Government contractors, either of government-unique or commercial items, are required to submit a written report to the government if they have "reasonable grounds to believe that a violation of [the Act] may have occurred." 41 U.S.C. § 8703(c)(1).

104.   Each time an ineligible small business misrepresents in its self-certifications that it is a "small business" in order to win a set-aside opportunity, the large business has won a bid that should have been awarded to a legitimate small business instead.  The large business that has misrepresented its size has gained an unfair advantage over honest businesses that have not made such misrepresentations.

105.   The SBA has identified such firms as "bad actors," who are "taking intentional and often fraudulent advantage" of SBA programs. *Helping Small Businesses Compete: Challenges Within Programs Designed to Assist Small Contractors: Hearing Before the Subcomm. On*

22

*Contracting & Workforce of the H. Small Bus. Comm.* ("*Helping Small Businesses*"), 112th Cong. 4 (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration), *available at* https://smallbusiness.house.gov/uploadedfiles/jordan_testimony.pdf.

106. The SBA "has no tolerance for a firm found to be acting fraudulently," adding that, where appropriate, the agency "will act decisively to oust them from our programs and from doing business with the government generally." *Id.*

107. Further, the SBA is continuing to take action and make referrals to the Department of Justice "against any firm attempting to 'game the system'" with SBA programs. *Small Business Contracts: How Oversight Failures and Regulatory Loopholes Allow Large Businesses to Get and Keep Small Business Contracts: Hearing Before the Ad Hoc Subcomm. On Contracting Oversight of the S. Comm. On Homeland Security and Gov'tl Affairs*, 112th Cong. 2 (2011) (statement of Joseph G. Jordan, Associate Administrator for Government Contracting and Business Development, U.S. Small Business Administration), *available at* https://www.gpo.gov/fdsys/pkg/CHRG-112shrg68018/pdf/CHRG-112shrg68018.pdf.

108. The SBA has stated that it "will come down hard on those who seek to take unfair advantage of our programs and services to the detriment of the many honest small businesses that depend upon those programs and services." *Helping Small Businesses*, *supra*, at 5.

## V.   DEFENDANTS' FRAUDULENT CONDUCT

109. In approximately 2011, Hensel Phelps was awarded a $68 million contract (Contract Number GS-11P-10-MK-C-0026) by the General Services Administration ("GSA") to develop the AFRH's New Commons/Health Care Building located at 3700 North Capitol Street, NW in Washington, D.C.

110.   The project scope included supplying and installing kitchen equipment. Because Hensel Phelps did not normally perform these specific services, it needed to subcontract the work to another company, preferably a small business. Per the terms of its contract with GSA, Hensel Phelps could claim financial credit from the government for awarding the subcontract to an eligible small business.

111.   Sometime in mid to late 2011, Hensel Phelps awarded the million-dollar first-tier subcontract to a SDVOSB, despite three critical facts: (1) the SDVOSB never submitted a bid proposal to Hensel Phelps; (2) the SDVOSB had never before served as a subcontractor on a federal construction project; and (3) Hensel Phelps had never previously worked with the SDVOSB.

112.   But Hensel Phelps's interest in seeing the SDVOSB brought on as the first-tier subcontractor was not altruistic. Rather, as part of a prior arrangement with TriMark Gill Group ("TriMark")—a large business under the relevant SBA size standards—Hensel Phelps would in reality give the work under the subcontract directly to TriMark and then claim monetary credit from the government for ostensibly subcontracting to a small business on a federally-funded project.

113.   In fact, Hensel Phelps and TriMark had already agreed to the terms of the subcontract, including pricing, before the SDVOSB was even brought into the picture. And the predetermined pricing left the SDVOSB with only a 1.5% fee for performing the subcontract—an unfeasible fee for any small business that was tasked with performance on a subcontract of this scope.

114.   In a letter dated December 5, 2011, Hensel Phelps provided the SDVOSB and TriMark with a copy of the Joint Check Agreement that was in response to a request that

TriMark—not the SDVOSB—made regarding the manner in which Hensel Phelps would pay for the work under the subcontract. Like the 1.5% small business fee and the remaining terms of the subcontract, the terms of the Joint Check Agreement were agreed to by Hensel Phelps and TriMark, without any input from (or the knowledge of) the SDVOSB.

115.   Hensel Phelps and TriMark also agreed that the SDVOSB would enter into a second-tier subcontract with TriMark. And the terms of the second-tier subcontract between the SDVOSB and TriMark were negotiated and agreed to by Hensel Phelps and TriMark—without any input from the SDVOSB. In fact, on December 8, 2011, Hensel Phelps' Office Engineer emailed this already-negotiated second-tier subcontract to the SDVOSB and TriMark, stating "[p]lease find attached a copy of the 2-tier subcontract for both parties to sign." This was not an arm's length transaction, as Hensel Phelps provided no opportunity for review or comment by the SDVOSB.

116.   There was additional ample evidence that Hensel Phelps never intended the SDVOSB to actually perform the services required under the subcontract. This included Hensel Phelps' failure to request or obtain even the most basic information that a prime contractor typically asks of a subcontractor before agreeing to work together on a federal government project.

117.   For example, Hensel Phelps never received a bid proposal from the SDVOSB and never inquired about the SDVOSB's financial statements, including annual revenue, tax returns or average contract size. Nor did Hensel Phelps inquire about the SDVOSB's company profile, including basic information like where the SDVOSB maintained offices, the type of work it performed, the type of work performed using its own employees, any union affiliations, and whether the SDVOSB had any facility clearances.

118. Hensel Phelps did not inquire about the SDVOSB's certifications or licenses, including MBE, WBE, SBE or other type of certified business enterprises until after Hensel Phelps and TriMark had agreed to the substantive terms of the subcontract.

119. Hensel Phelps did not ask the SDVOSB about its state license numbers.

120. Hensel Phelps never inquired about the SDVOSB's health and safety profile, including its Workers Compensation Experience Modification Rate ("EMR"), safety ratings, or OSHA logs.

121. And critically, Hensel Phelps did not inquire about the SDVOSB's insurance or surety information, including total bonding capacity, bonding capacity per project, bond rate, bonding agent references, surety references, or insurance references until after Hensel Phelps and TriMark had agreed to the substantive terms of the subcontract.

122. Hensel Phelps' failure to initially inquire about the SDVOSB's bonding was particularly noteworthy because federal government construction contracts require contractors to obtain third-party performance bonding.  When underwriting these bonds, insurers require construction company owners to indemnify the bond insurer for any bond claim payments. Past contract performance and contractor and indemnifier balance sheets control bond availability.

123. TriMark was (and is) a successful and profitable business that had access to significant bonding ability.  Meanwhile, in 2011, the SDVOSB was still getting started as a business itself, had generated very little revenue, had minimal past contract performance to rely upon, and thus would have been unable to secure the necessary bonding to serve as a subcontractor on a project of this size.

124.   In fact, the SDVOSB had never previously obtained bonding for any project. Hensel Phelps was fully aware of the SDVOSB's limitations—financial and otherwise—as evidenced by the fact that Hensel Phelps knew that TriMark secured the bonding for itself and the SDVOSB.

125.   Hensel Phelps's knowledge of this is evident in multiple communications with TriMark. For example, in an email dated December 14, 2011, Hensel Phelps' Office Engineer asked Kandy McClowry and Laura Gill at TriMark—not the SDVOSB—regarding the status of the bonds and the contact information to verify the bonds for the subcontract.

126.   The underlying bonds betray the true nature of Hensel Phelps' and TriMark's pass through arrangement. The payment bond—executed on November 7, 2011—and the performance bond—executed on December 7, 2011—both list TriMark as the principal responsible for the obligations under the subcontract. The only reference to the SDVOSB was as a "Dual Obligee" along with Hensel Phelps. And in an email dated December 7, 2011, Hensel Phelps' Office Engineer instructed TriMark—not the SDVOSB—to "[p]lease use the final contract value reflected at the bottom page of CO #1 [$922,700] for your bond coverage." Ultimately, Hensel Phelps never required separate bonding from the SDVOSB, revealing that Hensel Phelps never expected the SDVOSB to actually perform work under the subcontract.

127.   Hensel Phelps maintained copies of all the signed changes orders under the subcontract for the bonding company. For one such change order, Hensel Phelps had not yet received a signed copy to provide to the bonding company. Thus, in a November 27, 2012 email, Hensel Phelps' Office Engineer asked TriMark—not the SDVOSB—"Are you ok with this? The reason I am asking is because the surety company is through [TriMark]."

27

128.   Hensel Phelps withheld from the government its knowledge that TriMark—not the SDVOSB—was responsible for securing the bonds under the subcontract, further concealing this fraudulent scheme.

129.   For its part, the SDVOSB was able to provide a certificate of insurance, though TriMark still provided portions of the coverage on behalf of the SDVOSB—all with Hensel Phelps's knowledge.   For example, in an August 7, 2012 email from Kandy McClowry—a Contract Specialist at TriMark—she instructs the SDVOSB to secure a certificate of insurance identical to TriMark's, but notes that "[w]ith regard to the work comp & auto insurance, [TriMark] carries those coverages, you are not required to have that coverage on your COI. That has been confirmed with Rachelle [from Hensel Phelps]." In another email, also dated August 7, 2012, McClowry notes that she had been "playing phone tag" with her Hensel Phelps contact about the insurance on the contract thereby confirming that Hensel Phelps was communicating directly with TriMark about the project's insurance coverage without the SDVOSB's involvement.

130.   Hensel Phelps also knew that TriMark exercised control over all pricing and delivery terms for each change order for the project, because TriMark coordinated directly with Hensel Phelps.  TriMark—not the SDVOSB—told Hensel Phelps when a change order would be needed. TriMark—not the SDVOSB—provided product specifications, submittals, and pricing for the change order, sought clarification from Hensel Phelps, and negotiated details of the change order. The SDVOSB was only involved after negotiations were complete and the change order needed to be signed.

131.   In a March 8, 2012 email about a change order, Hensel Phelps' Office Engineer explained to the SDVOSB: "Upon [TriMark's] confirmation, please print (3) copies, sign and mail the originals to our jobsite address."  Another email, dated April 6, 2012, Hensel Phelps' Office

Engineer states "Per my conversation with [TriMark], please see revised CO…[SDVOSB]- please sign (3) original copies and mail it to our job site address."

132.   Further, during the performance of the subcontract, Hensel Phelps's Project Engineer emailed TriMark—without even copying the SDVSOB—in multiple emails regarding delivery dates of equipment and other project logistics and would only copy the SDVOSB on an email when he had not gotten a response from TriMark regarding equipment delivery or installation:

-----Original Message-----
From: Kevin Redemann [mailto:KRedemann@gillgroupinc.com]
Sent: Friday, December 07, 2012 1:49 PM
To: Paschalides, Alex
Cc: Doherty, John J.
Subject: RE: Deliveries

Attached are the items that we plan to deliver and begin installing on Tuesday the 11th.

Let me know if you have any questions.

Kevin Redemann
Project Manager
TriMark Gill Group
2128 Espey Court, Crofton, MD 21114
800-666-1418
kredemann@gillgroupinc.com


-----Original Message-----
From: Paschalides, Alex [mailto:APaschalides@henselphelps.com]
Sent: Wednesday, December 05, 2012 5:54 AM
To: Kevin Redemann
Subject: Deliveries

Can you get me the update on your deliveries we discussed a while back?

Including bar and ff&e. Thanks

Sent from my iPhone

> **From:** Doherty, John J. [mailto:JDoherty@henselphelps.com]
> **Sent:** Wednesday, December 19, 2012 7:33 AM
> **To:** Kevin Redemann
> **Cc:** Ackerman, Allison L.
> **Subject:** RE: Residential Hoods_3rd Floor and Fire Alarm Contacts
>
> Kevin,
>
> We need the Hoods installed on the 3rd Floor and knock-outs provided for the electrician to make
> the fire alarm contact connections.  This needs to happen today – please give me a call when you get
> this.
> Thanks,
>
> John Doherty
> Project Engineer
> Hensel Phelps Construction Co.
> AFRH – Scott Project
> 3700 N. Capitol St., NW #1327
> Washington, DC, 20011–8400
> 202.450.6782 (Office)
> 571.259.5816 (Cell)
> 202.629.2912 (Fax)
> jdoherty@henselphelps.com

> **From:** Doherty, John J.
> **Sent:** Wednesday, December 19, 2012 5:45 PM
> **To:** KRedemann@gillgroupinc.com
> **Cc:** Leslie Ellison (LEllison@gillgroupinc.com); M        **SDVOSB**
> Paschalides, Alex; Gomez, Edward G.
> **Subject:** RE: Install Crew - Trimark
>
> Kevin,
>
> We are really starting to get concerned about the list of growing issues, including the lack of any work at all this week in the
> Kitchen.  To follow on Alex's email, we definitely need to have a meeting to discuss your plan for completing the job.  This may
> sound obvious, but if your installer is not being responsive enough, then you need to start working on a plan B.  I can't tell the
> Owner that we're not going to finish on time because Gill's Group's installed was being unresponsive.  Here's the list of things that
> I know about:

133.    This same Hensel Phelps Project Engineer knew that TriMark—not the SDVOSB—was providing the certified payroll records for the installers of the equipment under the subcontract. For example, in an email dated December 6, 2012, Hensel Phelps' Project Engineer asked TriMark's Kevin Redemann and Leslie Ellison—not the SDVOSB—for the status of the certified payroll records of the installers on the site.

134.    The SDVOSB only signed the close out documents for the subcontract after Hensel Phelps and TriMark collected them, filled them out, and approved them—without input from the

SDVOSB.  In a May 6, 2013 email, TriMark informed the SDVOSB that the documents were ready to sign "[a]fter all the back & forth with [Hensel Phelps]" and instructed the SDVOSB to sign the close out documents and send them back to Hensel Phelps.

135.  With regard to payment under the subcontract, Hensel Phelps was fully aware of the SDVOSB's role as a mere pass-through and compensated the SDVOSB accordingly.  In a March 5, 2013 email to TriMark and the SDVOSB, Hensel Phelps' Office Engineer noted that he "was assuming you have been submitting (2) pay apps every month – 1 pay app for [the SDVOSB]'s Fee and 1 for Trimark's [statement of work]."  The payment terms acknowledged by Hensel Phelps' Office Engineer reflect the arrangement that Hensel Phelps and TriMark agreed to before the SDVOSB was ever brought on to the AFRH project; TriMark would perform all the substantive work under the subcontract, while the SDVOSB would be paid a "fee" for the use of its small business classification.

136.  Hensel Phelps never expected the SDVOSB to do any work relating to the subcontract.  Hensel Phelps was thus assured of working with an established large business like TriMark, which had the experience, personnel and high bondability that an actual small business like the SDVOSB could not provide.

137.  As a result, Hensel Phelps was able to claim financial credit for subcontracting the project to a small business, even though Hensel Phelps knew the SDVOSB was not providing any value and that TriMark was performing all of the substantive work under the subcontract.

## VI.   DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

138.  Businesses seeking to do business with the government must complete and sign a FAR Report that contains representations and certifications relating to the businesses' eligibility

31

to participate in certain government programs. This FAR Report, which is ultimately submitted in the SAM database, contains the following averment:

> I have read each of the FAR and DFARS provisions presented below. By submitting this certification, I, [company representative], am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table. I understand that I may be subject to penalties if I misrepresent [the company] in any of the below representations or certifications to the government.

139. In addition, contractors (like Defendants) who do business with the government typically submit invoices for payment to the government using paper, email (less common), and electronic portals (most common).

140. The process begins when a contractor completes an electronic invoice form, which requires certain information including the contract number, the contractor's code and the method for payment.

141. Hensel Phelps submitted numerous false claims to the government in the form of invoices, which impliedly certified that Defendants had awarded subcontracts to eligible small business concerns.

142. Also, Hensel Phelps made fraudulent representations to the United States each time it submitted its semi-annual ISRs or SSRs, in which they disclosed the details of each of the subcontracts purportedly awarded to small businesses, as well as the extent of their compliance with their Small Business Subcontracting plan.

143. Hensel Phelps' fraudulent scheme served its intended purpose, as they induced the government to pay Hensel Phelps bonuses as well as other monies for services that involved work performed by ineligible small business subcontractors.

144. The intentional misrepresentations regarding the SDVOSB's true size (when including average annual receipts from affiliated ostensible subcontractors) that were contained in

Hensel Phelps' certifications submitted to the government, were false within the meaning of the FCA.

145.   Claims for payments submitted by Hensel Phelps to the government, in part or in whole, were based on their knowledge that the SDVOSB was not actually performing the work required by the subcontract, and thus were false within the meaning of the FCA.

146.   Government Programs paid Hensel Phelps bonuses, increasing revenue and profits, based on Hensel Phelps' false claims and certifications, and as a result have incurred significant damages due to Hensel Phelps' intentional misrepresentations regarding the SDVOSB's size and status as a small business on the AFRH project.

147.   By falsely certifying their eligibility to receive monies on small business subcontracts and causing subsequent claims for payment to be made that Hensel Phelps knew were ineligible for payment by government Programs, Hensel Phelps also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as alleged herein.

148.   Hensel Phelps' unlawful conduct resulted in tens of millions of dollars in improper payments by government Programs.

## VII.   DEFENDANTS IMPROPERLY SOLICITED/PAID /RECEIVED KICKBACKS IN VIOLATION OF THE AKA

149.   Hensel Phelps regularly solicited, paid, and/or received kickbacks in the form of small business "fees" for use of small business classifications in violation of the AKA and the FCA.

150.   An AKA violation is a proper predicate for FCA liability on the grounds that:  1) Hensel Phelps expressly undertook to comply with the AKA as a condition of payment under the Prime Contract and their flow down provisions, and thereafter certified (expressly and/or impliedly) that they had complied with the AKA as a condition of payment, thereby supporting

33

liability for making false certifications (express and/or implied); and/or 2) violations of the AKA "taint" the claims submitted to the government and render the claims "factually false" and ineligible for payment because they violate a condition of payment.

151.   On numerous occasions, Hensel Phelps had reasonable grounds to believe that violations of the AKA were occurring, and yet failed to promptly report the possible violations in writing to the government.  These failures constituted further violations of the AKA.

152.   Hensel Phelps violated the FCA by expressly or impliedly making false statements, records, or certifications in response to the government requests for proposal that they were in compliance and would continue to comply with the AKA.

153.   Hensel Phelps committed additional violations of the FCA by presenting or causing to be presented to the government their claims to obtain payment in which they expressly or impliedly made false statements, records or certifications that they had complied with the AKA.

154.   The United States government, either directly or indirectly through its agencies or intermediaries, would not have contracted with Hensel Phelps due to conflict or other reasons and/or would have sought significant cost and/or price concessions had it known that the contracts/subcontracts, products, and/or services for which the contracts were proposed were subject to a scheme to violate the AKA provisions and pertinent FARs.

155.   The United States government, either directly or indirectly through its agencies or intermediaries, would not have honored Hensel Phelps' claims for payment, had it known that the contracts/subcontracts, products, and/or services for which the claims were made, were provided in a manner that violates the AKA provisions and pertinent FARs.

000161.01140 Litigation 16171080v1

## COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

156.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

157.    This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729–3733.

158.    Through the acts described above, Defendants and their agents and their employees knowingly misrepresented submitted or caused to be submitted to the United States government knowingly false or fraudulent claims for set-aside small business contracts.

159.    As alleged herein, Defendants' representations to the United States were knowingly false.  By engaging in the conduct alleged herein, Defendants knowingly submitted, or caused to be submitted, false claims for payment to the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

160.    Through the acts described above, Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States government.

161.    The United States, unaware of the falsity of the records, statements and claims made by Defendants, paid Defendants for claims that would otherwise not have been allowed.

162.    By reason of Defendants' false records, statements and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

35

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

163.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

164.   As alleged herein, Defendants knowingly made false representations to the United States.  Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

165.   Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the FCA, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

166.   By reason of Defendants' false records, statements, and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

167.   As a result of Defendants' actions as set forth above, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

## COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

168.   Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

169.   As alleged in detail above, Defendants knowingly avoided or decreased their obligation to pay or transmit money to the government.  Specifically, Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

170.   As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

171.   By reason of Defendants' false records, statements, and claims, the United States has been damaged and continues to be damaged in the amount of tens of millions of dollars.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729–3733;

B.     That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Relator, to be identified at trial after full discovery;

D.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

E.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

F.     That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

000161.01140 Litigation 16171080v1

G.     That Relator be granted such other and further relief as the Court deems just and proper.

## IX.    JURY TRIAL DEMAND

Relator demands a trial by jury of all issues so triable.

Dated: April 15, 2022

By:     _Michelle & Merole_

**HODGSON RUSS LLP**
Daniel Oliverio, Bar Roll No. 517878
Michelle L. Merola, Bar Roll No. 514446
677 Broadway, Suite 301
Albany, New York 12207
Tel. No.: 518.465.2333

**BARON & BUDD, P.C.**
Andrew M. Miller (*pro hac vice* to be filed)
Will Powers (*pro hac vice* to be filed)
600 New Hampshire Avenue, NW,
Washington, DC 20037
Tel. No.: 202.333.4562

*Attorneys for Plaintiff/Relator*

000161.01140 Litigation 16171080v1