SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into among (i) the United States of America, acting through the United States Attorney's Office for the Northern District of New York and the United States Attorney's Office for the Eastern District of Washington (collectively, the "United States"); (ii) Hensel Phelps Construction Company ("Hensel Phelps" or "Defendant"); and (iii) Fox Unlimited Enterprises, LLP ("Relator"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

RECITALS

A. Congress has adopted measures to ensure that a fair proportion of federal contract and subcontract dollars are awarded to small business concerns. Agencies are responsible for achieving these goals by awarding prime contracts to small businesses, and contractors that are "other than small" are required to ensure that the small business subcontracting goals are met. For example, contractors that compete for construction contracts worth more than $1.5 million must submit a small business subcontracting plan to the government that specifies how it will attract small businesses and ensure that such businesses have a maximum practicable opportunity to subcontract. FAR § 19.702. "[A]ny contractor or subcontractor failing to comply in good faith with the requirements of the subcontracting plan is in material breach of its contract." FAR § 19.702(c).

B. Hensel Phelps is a general contractor and construction firm and one of the largest public/government building contractors in the United States.

C. In 2011, the General Services Administration ("GSA") awarded Hensel Phelps Contract No. GS-11P-10-MK-C-0026, which was a multi-million dollar contract

to construct the Armed Forces Retirement Home's ("AFRH") New Commons/Health Care Building, in Washington, D.C.

D.  The contract's scope included supplying and installing kitchen equipment. Since Hensel Phelps did not normally perform those services, and to help meet its small-business subcontracting goals, Hensel Phelps entered a $1,078,504 subcontract with a service-disabled veteran-owned small business ("the SDVOSB") to perform that work.

E.  Hensel Phelps initially negotiated the terms of the subcontract with a large business ("Company 1") without the involvement of the SDVOSB, and agreed to the terms of the subcontract, including pricing. That subcontract was never executed. Hensel Phelps then entered a subcontract with the SDVOSB utilizing the same terms and pricing that were set forth in the draft subcontract that Hensel Phelps had negotiated with Company 1. The pricing left the SDVOSB with a 1.5% fee for its responsibilities on the subcontract.

F.  Hensel Phelps and Company 1 agreed that the SDVOSB would enter a second-tier subcontract with Company 1, and the terms of the second-tier subcontract were negotiated and agreed to by Hensel Phelps and Company 1 without any input from the SDVOSB. In December 2011, a Hensel Phelps official emailed this pre-negotiated second-tier subcontract to the SDVOSB and Company 1, stating "[p]lease find attached a copy of the 2-tier subcontract for both parties to sign."

G.  Hensel Phelps, which had never before worked with the SDVOSB, also failed to request or obtain certain information that a prime contractor typically asks of a subcontractor before agreeing to work together on a federal government project. For example, Hensel Phelps never (i) requested or received a bid proposal from the

2

SDVOSB, (ii) inquired about the SDVOSB's financial statements (including annual revenue, tax returns or average contract size), (iii) inquired about the SDVOSB's company profile (including where the SDVOSB maintained offices, the type of work it has performed in the past, the type of work it has performed using its own employees, any union affiliations, and whether the SDVOSB had any facility clearances), (iv) requested the SDVOSB's state license numbers, (v) requested information about the SDVOSB's health and safety profile, including its Workers Compensation Experience Modification Rate, safety ratings, or OSHA logs, or (vi) inquired about the SDVOSB's insurance or surety information, including its total bonding capacity, bonding capacity per project, bond rate, bonding agent references, surety references, or insurance references until after Hensel Phelps and Company 1 negotiated the subcontract. Hensel Phelps represents that it did review the SDVOSB's self-certification through the federal small business database whereby the SDVOSB self-certified its small, disadvantaged and veteran business status.

  H. Hensel Phelps knew that Company 1 secured bonding for itself and the SDVOSB. For example, in December 2011, a Hensel Phelps official reached out to Company 1 – not the SDVOSB – to inquire about the status of Company 1's bonding and the contact information to verify bonds for the Company 1 subcontract. Both the payment and performance bonds list Company 1 as the principal responsible for the obligations under the subcontract, and listed both the SDVOSB and Hensel Phelps as dual obligees under the bonds. Hensel Phelps never required separate bonding from the SDVOSB.

3

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

I. Hensel Phelps also knew that Company 1 exercised control over all pricing and delivery terms for each change order for the project, because Company 1 coordinated those issues directly with Hensel Phelps. Company 1 – not the SDVOSB – told Hensel Phelps when a change order would be needed. Company 1 – not the SDVOSB – provided product specifications, submittals, and pricing for the change order, sought clarification from Hensel Phelps, and negotiated details of the change order. The SDVOSB was only involved after negotiations were complete and the change order needed to be signed.

J. Further, during performance of the subcontract, Hensel Phelps emailed Company 1 directly, on multiple occasions, regarding delivery dates of equipment and other project logistics.

K. Hensel Phelps also knew that Company 1 – not the SDVOSB – was providing the certified payroll records for the installers of the equipment under the subcontract. For example, in December 2012, a Hensel Phelps official asked Company 1 officials – with a copy to the SDVOSB – for this information. When Company 1 was non-responsive to the certified payroll requests, the SDVOSB stepped in to ensure the required information was provided.

L. The SDVOSB only signed the close out documents for the subcontract after Hensel Phelps and Company 1 collected them, filled them out, and approved them – without input from the SDVOSB. In a May 2013 email, Company 1 informed the SDVOSB that the documents were ready to sign "[a]fter all the back & forth with [Hensel Phelps]" and instructed the SDVOSB to sign the close out documents and send them back to Hensel Phelps.

4

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

M.      Hensel Phelps should have been aware of the SDVOSB's role as a pass-through.  In a March 2013 email to Company 1 and the SDVOSB, a Hensel Phelps official noted that he "was assuming you have been submitting (2) pay apps every month – 1 pay app for [the SDVOSB]'s Fee and 1 for [Company 1's statement of work]."  The above-quoted email reflects the reality of the work allocation and value added by Company 1 and the SDVOSB to the AFRH project:  Company 1 performed all or nearly all substantive work and received 98.5% of payments under the subcontract; the SDVOSB was paid the remaining 1.5% as its "fee"; and Hensel Phelps claimed small business credit for 100% of the subcontract amount.

N.      Hensel Phelps submitted subcontracting reports to the federal government in which it claimed $1,078,504 in credit for subcontracting the work described above to the SDVOSB.

O.      On April 15, 2022, Relator filed a *qui tam* action in the United States District Court for the Northern District of New York captioned *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Co.*, No. 1:22-cv-355, pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b) (the "Civil Action").  Relator alleges, among other things, that Hensel Phelps presented and caused to be presented false claims and statements to the United States in connection with the AFRH project subcontract award to the SDVOSB described herein.  The United States intervened in the Civil Action on May 6, 2022.  The United States contends that it has certain civil claims against Hensel Phelps under the False Claims Act, codified at 31 U.S.C. §§ 3729-3733, and the common law, as specified below, for engaging in the

5

conduct set forth in this Paragraph, as well as Paragraphs A-N above (the "Covered Conduct"):

> The United States alleges that the conduct set forth in Paragraphs A-N above was part of a scheme devised and engaged in by Hensel Phelps and Company 1 to circumvent federal procurement requirements designed to promote contracting and subcontracting between small businesses and the government. Specifically, the United States alleges that Hensel Phelps and Company 1 never intended for the SDVOSB to substantively perform work for the government on the AFRH project, and in fact the SDVOSB neither substantively performed on the contract nor otherwise added value to the transaction aside from its set-aside status.
>
> The United States further alleges that Hensel Phelps made various false certifications and representations to the government in connection with this transaction. For example, Hensel Phelps certified falsely that it intended to comply in good faith with the terms of its small business subcontracting plan. It also submitted monthly progress payment requests falsely certifying and misrepresenting to the government that it was fulfilling its material obligations to comply in good faith with its subcontracting plan. And it filed false Interim Subcontracting Reports concerning the progress toward meeting its Subcontracting Plan.
>
> The United States alleges that the foregoing conduct resulted in the diversion of a subcontract and benefits therefrom intended for a small business toward an ineligible large company, thereby undercutting the purpose of statutorily created programs designed to encourage contract and subcontract awards to legitimate small businesses.

P.  Hensel Phelps admits, acknowledges, and accepts responsibility for that which is set forth in Paragraphs A-N above, as well as for the following: (i) Hensel Phelps' conduct in connection with the transaction described herein resulted in violations of federal regulations designed to encourage contract awards to legitimate small businesses, (ii) Hensel Phelps exercised reckless disregard in satisfying its obligation to ensure that the SDVOSB substantively performed under its subcontract with Hensel

6

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

Phelps, and (iii) given the circumstances, it was inappropriate for Hensel Phelps to have claimed credit for subcontracting work to the SDVOSB on the AFRH project.

Q. This Settlement Agreement is not an admission of liability by Hensel Phelps nor a concession by the United States that its claims are not well founded.

R. Relator claims entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relator's reasonable expenses, attorneys' fees and costs.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

## TERMS AND CONDITIONS

1. Hensel Phelps shall pay to the United States $2,804,110.40 ("Settlement Amount"), of which $1,078,504 is restitution, by electronic funds transfer pursuant to written instructions to be provided by the United States no later than 10 days after the Effective Date of this Agreement.

2. Conditioned upon the United States receiving the Settlement Amount and as soon as feasible after receipt, the United States shall pay $630,925 to Relator by electronic funds transfer ("Relator's Share").

3. Following the Effective Date of the Agreement and within 7 days after receiving written instructions from Relator, Hensel Phelps agrees to pay to Relator $62,783.90 pursuant to 31 U.S.C. § 3730(d) for expenses, attorney's fees, and costs arising from the filing of the Civil Action.

7

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

4. Subject to the exceptions in Paragraph 6 (concerning reserved claims) below, and upon the United States' receipt of the Settlement Amount, the United States releases Hensel Phelps, together with its current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

5. Subject to the exceptions in Paragraph 6 below, and upon the United States' receipt of the Settlement Amount, Relator, for itself and for its members' partners, heirs, successors, attorneys, agents, and assigns, releases Hensel Phelps from any civil monetary claim the Relator has on behalf of the United States for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733.

6. Notwithstanding the releases given in Paragraph 4 of this Agreement, or any other term of this Agreement, the following claims and rights of the United States are specifically reserved and are not released:

    a. Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

    b. Any criminal liability;

    c. Except as explicitly stated in the Agreement, any administrative liability or enforcement right, or any administrative remedy,

8

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

       including the suspension and debarment rights of any federal agency;

d. Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e. Any liability based upon obligations created by this Agreement;

f. Any liability of individuals;

g. Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

h. Any liability for failure to deliver goods or services due; and

i. Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7. Relator and its partners, heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator's receipt of the Relator's Share, Relator and its partners, heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Action or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Action.

8. Relator, for itself, and for its partners, heirs, successors, attorneys, agents, and assigns, releases Hensel Phelps, and its officers, agents, and employees, from any

9

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

liability to Relator arising from the filing of the Civil Action, or under 31 U.S.C. § 3730(d) for expenses or attorneys' fees and costs.

9. Hensel Phelps waives and shall not assert any defenses Hensel Phelps may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10. Hensel Phelps fully and finally releases the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Hensel Phelps has asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct or the United States' investigation or prosecution thereof.

11. Hensel Phelps fully and finally releases the Relator, and its members partners, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Hensel Phelps has asserted, could have asserted, or may assert in the future against the Relator, related to the Covered Conduct and the Relator's investigation and prosecution thereof.

12. a. Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Hensel Phelps, and its present or former officers, directors, employees, shareholders, and agents in connection with:

10

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

    (1) the matters covered by this Agreement;

    (2) the United States' audit(s) and civil and any criminal investigation(s) of the matters covered by this Agreement;

    (3) Hensel Phelps' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

    (4) the negotiation and performance of this Agreement;

    (5) the payment Hensel Phelps makes to the United States pursuant to this Agreement and any payments that Hensel Phelps may make to Relator, including costs and attorneys' fees,

are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

  b. Future Treatment of Unallowable Costs:  Unallowable Costs will be separately determined and accounted for by Hensel Phelps, and Hensel Phelps shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

  c. Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, Hensel Phelps shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by Hensel Phelps or any of

11

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

its subsidiaries or affiliates from the United States. Hensel Phelps agrees that the United States, at a minimum, shall be entitled to recoup from Hensel Phelps any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Hensel Phelps's books and records and to disagree with any calculations submitted by Hensel Phelps or any of its subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Hensel Phelps, or the effect of any such Unallowable Costs on the amount of such payments.

13. This Agreement is intended to be for the benefit of the Parties only.

14. Upon receipt of the payment described in Paragraph 1, above, the United States and Relator shall promptly sign and file in the Civil Action a Joint Stipulation of Dismissal of the Civil Action pursuant to Rule 41(a)(1). The Joint Stipulation shall be (i) with prejudice as to the United States' and the Relator's claims as to the Covered Conduct, and (ii) without prejudice as to the United States and with prejudice as to the Relator as to all other allegations set forth in the Civil Action.

15. Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

16. Each Party and signatory to this Agreement represents that it freely and voluntarily enters into this Agreement without any degree of duress or compulsion.

17. This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Northern District of New York. For purposes of construing

12

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

18. This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

19. The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

20. This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

21. This Agreement is binding on Defendant's successors, transferees, heirs, and assigns.

22. This Agreement is binding on Relator's successors, transferees, heirs, and assigns.

23. All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

24. This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures and signatures in portable document format (.pdf) shall constitute acceptable, binding signatures for purposes of this Agreement.

13

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

FOR THE UNITED STATES OF AMERICA

Carla B. Freedman
United States Attorney

May 6, 2022

_____
Adam J. Katz
Assistant United States Attorney

Vanessa R. Waldref
United States Attorney

May 6, 2022

_____
Daniel Hugo Fruchter
Tyler Tornabene
Assistant United States Attorneys

FOR DEFENDANT HENSEL PHELPS
CONSTRUCTION COMPANY

May ___, 2022

_____
Seth B. Waxman
Dickinson Wright PLLC

May ___, 2022

_____
William Thompson
Vice President and District Manager

FOR RELATOR FOX UNLIMITED
ENTERPRISES, LLP AND ITS PARTNERS

May 6, 2022

_____
Andrew M. Miller
Baron & Budd, P.C.
Counsel for Relator

May 6, 2022

_____
Margaret Bullard-Marshall
Partner, Fox Unlimited Enterprises, LLP

14
Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)

FOR THE UNITED STATES OF AMERICA

Carla B. Freedman
United States Attorney

May ___, 2022

_____
Adam J. Katz
Assistant United States Attorney

Vanessa R. Waldref
United States Attorney

May ___, 2022

_____
Daniel Hugo Fruchter
Tyler Tornabene
Assistant United States Attorneys

FOR DEFENDANT HENSEL PHELPS
CONSTRUCTION COMPANY

May 6, 2022

_____
Seth B. Waxman
Dickinson Wright PLLC

May 6, 2022

_____
William Thompson
Vice President and District Manager

FOR RELATOR FOX UNLIMITED
ENTERPRISES, LLP AND ITS PARTNERS

May ___, 2022

_____
Andrew M. Miller
Baron & Budd, P.C.
Counsel for Relator

May ___, 2022

_____
Margaret Bullard-Marshall
Partner, Fox Unlimited Enterprises, LLP

14

Settlement Agreement: *United States ex rel. Fox Unlimited Enterprises, LLP v. Hensel Phelps Construction Company*, No. 1:22-cv-355 (N.D.N.Y.)